**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| RABBI SHMUEL HERZFELD | ) | |
| 1401 Floral Street, NW | ) | |
| Washington, D.C. 20012 | ) | |
| | ) | |
|        Plaintiffs, | ) | Case No. |
| | ) | |
|      v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| HAZAMI BARMADA | ) | |
| 11601 Cedar Chase Road | ) | |
| Herndon, Virginia 20170 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ATAFEH ROKHVAND | ) | |
| 9027 Burwell Road | ) | |
| Nokesville, Virginia 20181 | ) | |
| | ) | |
|        Defendants. | ) | |
| | ) | |

_____

**COMPLAINT**

Plaintiff Rabbi Shmuel Herzfeld, by and through his counsel, respectfully submits this

Complaint against Hazami Barmada and Atafeh Rokhvand arising from Defendants' physical

attack on Rabbi Herzfeld while he was praying in front of the Israeli Embassy in Washington,

D.C.  That attack was intended to, and did, injure Rabbi Herzfeld.  The physical attack consisted

of using speakers, sirens, and other sound-emitting devices to produce siren-like sounds in the

range of 95-100 decibels—more than 1,000 times the noise level permitted under D.C. law—

with the purpose and intent to injure Rabbi Herzfeld.  In support of his complaint, Rabbi

Herzfeld alleges as follows:

**NATURE OF THE ACTION**

1.  On March 22, 2024, Rabbi Herzfeld and a small group gathered in front of the Embassy of

    the State of Israel in Washington, D.C.  March 22, 2024 was Taanit Esther (the Fast of

    Esther), a day of religious observance immediately preceding the Jewish holiday of Purim.

    Rabbi Herzfeld's group came to offer prayers for the release of the hostages (including

    American citizens) held by Hamas in Gaza since October 7, 2023; for Israelis who were

    killed on October 7; and for the Israeli soldiers who had been killed fighting in Gaza since

    October 7.  Rabbi Herzfeld also had in mind the innocent residents of Gaza, who have long

    been victims of Hamas' diversion of the foreign aid and assistance intended to benefit the

    people of Gaza, and which instead has been used in the construction of the tunnel network,

    and the purchase of the weapons, that Hamas used on October 7, 2023 to kill, rape, torture,

    and capture more than 1,000 innocent civilians, including elderly men, women, and children.

    His thoughts also extended to the innocent victims of Hamas' well-known and well-

    documented practice, both before and since October 7, 2023, of using innocent Gaza civilians

    as human shields to protect Hamas militants hiding in and under schools, hospitals,

    apartment buildings, and other civilian structures, resulting in the deaths of thousands of

    innocent Gazans, including women and children, and the suffering of additional hundreds of

    thousands.

2.  As Rabbi Herzfeld and his group gathered at the embassy and began their prayers, they were

    surrounded by Defendants—who were wearing earplugs or sound-cancelling headphones—

    and who were already encamped in front of the embassy.  Defendants had sound-producing

    equipment (speakers and bullhorns) that were emitting extremely loud tones, that, upon

    information and belief, were intended to prevent any speech or other support for Israel.

    When Defendants saw that their noise emitting devices were not stopping Rabbi Herzfeld

from leading his group in prayer, Defendants and their followers increased the volume of the

siren-like sound being generated by the bullhorns, sirens and loudspeakers to levels that are

far in excess of those allowed by District of Columbia law.  Defendants' targeted Rabbi

Herzfeld in particular, and their purpose was to drown out his prayers, cause him physical

injury, and force him to leave the site.  Alerts received by those in Rabbi Herzfeld's group

indicated that the sound level had reached the 95-100 dB range, far in excess of safe limits

and limits set by D.C. law.  As the principal target of the attack, Rabbi Herzfeld suffered

acute acoustic trauma and other harm.

3.  Rabbi Herzfeld therefore brings this action for assault, battery, outrage, and other violations

as set forth below.

## THE PARTIES

4.  Rabbi Shmuel Herzfeld is a citizen and resident of the District of Columbia.  He is the

founder and religious leader of Yeshivas Elimelech, a Jewish school (*yeshiva*) in northwest

Washington, D.C.  During his tenure as religious leader of Yeshivas Elimelech, and

previously as a pulpit rabbi in Washington, D.C., Rabbi Herzfeld has worked to cross

religious lines by coordinating events with leaders of many faiths and denominations.

Among other things, he has spoken out to condemn racial profiling, including the targeting of

Arab-Americans and Muslims.  *See,* Herzfeld, "Invite a Muslim for Shabbat," *Jewish

Journal,* February 2, 2017, available at

*https://jewishjournal.com/commentary/opinion/214260/invite-muslim-shabbat/* (last visited

May 1, 2024).

5.  Defendant Hazami Barmada is a resident of the Commonwealth of Virginia.  She is a

    coordinator of the protests in front of the Israeli Embassy, and in front of the home of

    Secretary of State Antony Blinken.  Among the protesters, she is referred to as "The Leader."

6.  Defendant Atafeh Rokhvand is a resident of the Commonwealth of Virginia.  Along with

    Defendant Barmada, she is a coordinator of the protests in front of the Israeli Embassy, and

    in front of the home of Secretary of State Antony Blinken.  Among the protesters, she is

    referred to as "The Governor."

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

    § 1332(a)(1), as the amount in controversy exceeds $75,000 exclusive of interest and costs,

    and there is diversity of citizenship between the Plaintiff and the Defendants.

8.  Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the

    events giving rise to the claim occurred in this district.

9.  Defendants are subject to this Court's jurisdiction pursuant to D.C. Code § 13-423, in that

    Defendants caused tortious injury in the District of Columbia by acts or omissions in the

    District of Columbia, and Plaintiff's claims for relief arise from those acts or omissions.

## STATEMENT OF FACTS

**A.  The Events at the Israeli Embassy**

10. On or about March 21, 2024, Rabbi Shmuel Herzfeld sent invitations to several friends and

    colleagues suggesting that they meet to recite prayers at the Israeli Embassy in Washington,

    D.C.  Pursuant to Rabbi Herzfeld's invitation, a small group gathered in front of the Israeli

    Embassy at about 12:30 p.m. on March 22, 2024.  All of the men in Rabbi Herzfeld's group

    wore head coverings, and several wore a *kipah* or *yarmulke*, which is a traditional Jewish

head covering.  At least one of the participants in the Herzfeld group wore a *talit*¸ which is a traditional Jewish prayer shawl.  Rabbi Herzfeld also wore a *bekishe*, which is traditional frock coat that Orthodox Jewish men often wear during prayer.  As Rabbi Herzfeld and his group gathered in front of the embassy, they began to recite a prayer in Hebrew.

11. Already established at the embassy when Rabbi Herzfeld and his group arrived was a separate group carrying Palestinian flags and anti-Israel signs.  The members of this group were stretched along the entire city block in front of the embassy.  As Rabbi Herzfeld began to lead his group in prayer, the anti-Israel group gathered around the Herzfeld group's perimeter, and around Rabbi Herzfeld in particular.  In addition to surrounding the Herzfeld group and waving Palestinian flags near the group's heads, they began to shout through loudspeakers and bullhorns in an effort to drown out the prayer session.

12. At that time, Rabbi Herzfeld said to his group, "I want to recite a prayer for the hostages, so please record me."  In response, a member of the anti-Israel group shouted, "He wants […] to record him, so now it's time for the sirens."  The anti-Israel group then used a combination of loudspeakers, bullhorns, and sirens, in unison, to drown out Rabbi Herzfeld and other members of his group.  The anti-Israel group directed all of the amplification devices at Rabbi Herzfeld in particular.  Several of these devices were no more than a few yards from Rabbi Herzfeld.

13. This recording at the following link contains an unamplified recording of the sounds created by and at the instructions of Defendants, and directed at Rabbi Herzfeld.  (Readers are advised to take precautions to protect their ears before downloading the video.)

https://rothwellfigg-my.sharepoint.com/:v:/p/rparker/EfcjIesd0ztAsqF0V3nOeCMBoEydHuJE8g0bARLaYlm2r

A?nav=eyJyZWZlcnJhbEluZm8iOnsicmVmZXJyYWxBcHAiOiJPbmVEcml2ZUZvckJ1c2l uZXNzIiwicmVmZXJyYWxBcHBQbGF0Zm9ybSI6IldlYiIsInJlZmVycmFsTW9kZSI6InZp ZXciLCJyZWZlcnJhbFZpZXciOiJNeUZpbGVzTGlua0NvcHkifX0&e=ah2Lgk.

14. The members of the anti-Israel group had prepared for their onslaught by wearing ear plugs or other devices to protect their hearing.

15. The use of protective equipment by Defendants reflects their knowledge that the sound levels they were employing could cause physical pain and damage to individuals in the area, and their intent to cause such pain and injury. The members of Rabbi Herzfeld's group had no such protection.

16.  Several members of Rabbi Herzfeld's group received alarms on their devices that the sound had reached over 95 decibels (dB).  The effort to drown out Rabbi Herzfeld's prayers persisted for several minutes, without abatement.  As Rabbi Herzfeld and his group tried to pray, the sound level increased as Rabbi Herzfeld tried to make himself heard over the din.

17. This situation persisted until a member of the Israeli Embassy staff came out of the embassy to bring Rabbi Herzfeld and his group into the safety of the embassy's security building, which is adjacent to the embassy's main gate.  After a few minutes in the security facility, Rabbi Herzfeld and his group emerged from the security building and left the area, having been forced to stop their prayers.

18. After leaving the front of the gate, members of Rabbi Herzfeld's group approached members of local (D.C.) and federal law enforcement, who were providing security in the area around the embassy. They informed members of the group that they were not authorized to interfere with the use of loudspeakers, bullhorns, and sirens in front of the embassy.  They acknowledged, however, that the sound levels exceeded limits imposed by local law, and that

they had concerns regarding the danger that the excessive noise levels posed to human health (including the health of the law enforcement officers themselves).

19. Rabbi Herzfeld wishes to return to the Israeli embassy to show solidarity with those who have suffered as a result of the attack by Hamas on Israel, which resulted in the deaths of over 1200 Israeli citizens.  In addition, his intention is to pray for the hostages who have been held in Gaza since October 7, 2023, including infants, children, women who have been raped, people who are old and medically frail, all of whom have been held in barbaric and inhumane conditions; for the families of the remaining hostages, many of whom still have no idea whether their loved ones are alive or dead, and if alive, whether they are being tortured by their captors; and for the families of the Israeli soldiers who have been killed in an effort to secure the hostages' release and to protect the lives of their own families, friends, and fellow citizens – including Jewish, Muslim, and Christian Israelis – from future barbarity at the hands of Hamas.  Rabbi Herzfeld would offer prayers for those Gazans, including women and children, who are truly innocent of any hatred or animosity, but who for decades have been deprived by Hamas and its policies of the tools and resources Gazans need to lead prosperous lives, and ensure to that their children have the opportunities to do so as well. Rabbi Herzfeld would also offer prayers for those who are victims of Hamas' longstanding practice of using innocent Gazans, including women and children, as human shields. As a result of the conduct of the pro-Hamas protesters on March 22, 2024, Rabbi Herzfeld has been unable to do so because of the threat of further physical attacks and injury.

**B. The Effects of Loud Noise**

20. Sound is a pressure wave created by a vibrating object, such as the human vocal cords, or a mechanical device such as a loudspeaker.  The vibrations set particles in the surrounding

7

medium (*e.g.,* air) in motion, thereby transmitting energy through the medium.  The outer

part of the human ear collects the sound waves and directs them into the ear canal, where the

sound is amplified.  The waves continue towards the ear drum, causing the ear drum to

vibrate.  The vibration of the ear drum causes bones in the middle ear to vibrate, and thereby

transmit the waves to the inner ear.  In that portion of the ear, the vibrations enter the

cochlea, which is a spiral-shaped organ that contains small hairs and auditory nerve fibers.

From there, the mechanical vibrations are converted to electrochemical signals, and

transmitted by the auditory nerve to the brain.

21.  The U.S. Centers for Disease Control and Prevention ("CDC") states that noise-induced

hearing loss can result from a single loud sound.  The louder the sound, the shorter the

amount of time it takes for hearing loss to occur.  A loud noise can damage cochlear hair

cells, membranes, nerves or other parts of the human ear.  The damage to cochlear hair cells

and the auditory nerve is cumulative over time, and the ears may be damaged by a loud

sound even before changes in hearing can be detected in a hearing test.

22. Damage to hearing can be expected from sounds as low as 80-85 dB.  Sounds in the 100 dB

range can result in measurable hearing loss after only 15 minutes of exposure.  Because the

dB scale is logarithmic, a 10 dB increase in sound equals a 10-fold increase in the intensity of

the sound.  Thus, a sound that is 100 dB is 10 times louder than a sound that is 90 dB, and

100 times louder than a sound that is 80 dB.

**C.   Harm to Rabbi Herzfeld**

23. At the time of the attack, Rabbi Herzfeld immediately felt acute pain in his ear.  On his return

home, Rabbi Herzfeld continued to feel pain.  He consulted with an otolaryngologist, who

diagnosed acute acoustic trauma and prescribed medication.

24. The pain persisted into the following week, such that Rabbi Herzfeld was unable to participate fully in the March 23-24 celebration of the Jewish festival of Purim, and in other religious and personal activities during days following the events of March 22. Rabbi Herzfeld has continued to feel discomfort in his ears during the succeeding weeks.

25. Because the impact of loud noise on hearing is cumulative over time, the events of March 22 have increased Rabbi Herzfeld's risk of permanent and premature hearing loss, and may already have impaired his hearing in ways that cannot yet be determined or measured.

## COUNTT I
### (Battery)

26. Plaintiff realleges and incorporates paragraphs 1 through 25 as if fully set forth herein.

27. Defendants, by the acts described above, intended to cause a harmful or offensive contact with Rabbi Herzfeld, and harmful contact with Rabbi Herzfeld resulted from their actions. Specifically, by directing non-expressive sound in excess of 95 dB in Rabbi Herzfeld's direction from a short distance, they caused Rabbi Herzfeld to suffer acute acoustic trauma, as well as the accumulative effects to his hearing from the trauma.

28. By the acts described above, Defendants intentionally, knowingly, and/or recklessly caused Rabbi Herzfeld to suffer serious bodily injury as a result of their actions. For example, Rabbi Herzfeld suffered acute acoustic trauma at the time of the incident, as well as injury from the cumulative effects such trauma has on premature and permanent hearing loss.

## COUNT II
### (Assault)

29. Plaintiff realleges incorporates paragraphs 1 through 25 as if fully set forth herein.

30. By their acts described above, Defendants intentionally and knowingly targeted Rabbi Herzfeld with amplified non-expressive sound (including a siren) in excess of 95 dB.

31. Defendants knew at the time they engaged in these acts that the sound could and/or would cause imminent bodily harm to Rabbi Herzfeld.  In fact, Defendants brought the amplified sound within a few yards of Rabbi Herzfeld's position, and targeted him with the amplified sound, while at the same time Defendants protected themselves from harm by wearing earplugs or other devices.

32. Rabbi Herzfeld had a reasonable apprehension of bodily harm at the time of the Defendants' actions, and in fact did incur substantial injury from the onslaught as it happened and thereafter.

## COUNT III
### (Outrage)

33.  Plaintiff realleges incorporates paragraphs 1 through 25 as if fully set forth herein.

34. By their conduct on March 22, 2024, Defendants either intentionally or recklessly intended to inflict harm and/or cause distress to Rabbi Herzfeld.  In the alternative, Defendants intentionally directed noise in excess of 95 dB in Rabbi Herzfeld's direction, and they knew or should have known that such conduct would result in harm, including but not limited to emotional distress.

35. Defendants' conduct was outrageous, intolerable, and so extreme as to go beyond all possible bounds of decency.  For example, regulations set according to D.C. law set the daytime limit on maximum noise levels at 65 dB in a residential zone when measured from the perimeter of the property from which the sound emanates, and it is unlawful for "any person to make, continue, or cause to be continued, any noise disturbance by the operation, use, or playing of any . . .  device, loudspeaker, sound amplifier, or other similar device, or unamplified voice, for the production or reproduction of sound on private property or public space."  D.C. Mun. Regs. §§ 20-2701.1 and 20-2800.2.  Defendants knowingly and without regard to the health

of Rabbi Herzfeld or others, and for the sole purpose of interfering with his prayers, pointed

loudspeakers, bullhorns, and sirens in his direction, creating a noise that that was at least 30

dB (*i.e.,* at least 1,000-fold) above the legal limit.

36. As a result of Defendants' outrageous conduct, Rabbi Herzfeld suffered severe emotional

    distress and other harm.

## COUNT IV
### (Hate Violation Based on Religious and/or Ethnic Identity)

37. Plaintiff realleges incorporates paragraphs 1 through 25 as if fully set forth herein.

38. D.C. Code § 22-3704(a) provides: "…[A]ny person who incurs injury to his or her person or

    property as a result of an intentional act that demonstrates an accused's prejudice based on

    the actual or perceived race, color, religion, national origin, sex, age, marital status, personal

    appearance, sexual orientation, gender identity or expression, family responsibilities,

    homelessness, disability, matriculation, or political affiliation of a victim of the subject

    designated act shall have a civil cause of action in a court of competent jurisdiction for

    appropriate relief[.]"

39. D.C. Code § 22-3704(a) allows an aggrieved party (among other things) to collect damages

    for economic loss (including damages for emotional distress), punitive damages, costs of

    litigation, and attorneys' fees.

40. By the Defendants' conduct, Rabbi Herzfeld was subjected to acts of intimidation and

    harassment, and he was the victim of violence directed against his person.  In addition, Rabbi

    Herzfeld suffered injury as a result of Defendants' conduct.

41. Defendants' conduct was motivated by religious and/or ethnic animosity, and/or by

    animosity with respect to political affiliation.

## JURY DEMAND

42. Plaintiff respectfully requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Rabbi

Shmuel Herzfeld, and against Defendants, jointly and severally, on each and every Count set

forth above, and award Rabbi Herzfeld the following relief:

A. Damages sufficient to compensate Rabbi Herzfeld for Defendants' assault, battery,

outrage, and harassment on in violation of DC Code § 2203704, together with

prejudgment interest;

B. Punitive damages;

C. Injunctive relief prohibiting each of the Defendants (and those in active concert with

them) from harassing, obstructing, or interfering with Rabbi Herzfeld's activities,

including his leading of prayer, protests, or other lawful activities;

D. Costs, including the costs of litigation and reasonable attorneys' fees; and

E. Such other and further relief as the Court deems proper in the circumstances.

Dated:  May 1, 2024                     Respectfully submitted,

*/s/Robert P. Parker*
Robert P. Parker (DC Bar # 404066)
Steven Lieberman (DC Bar # 439783)
ROTHWELL, FIGG, ERNST & MANBECK PC
901 New York Avenue, NW, Suite 900 East
Washington, DC 20001
Tel: (202) 783-6040
Fax: (202) 783-6031

rparker@rfem.com
slieberman@rfem.com

Attorneys for Plaintiff