# ATTACHMENT A

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### DOMESTIC VIOLENCE DIVISION

| | | |
|---|---|---|
| **ATEFEH ROKHVAND** | : | |
| **Petitioner,** | : | **Case No. 2024 ASO 451** |
| **v.** | : | |
| | : | **Judge John McCabe** |
| **SHMUEL HERZFELD** | : | |
| **Respondent** | : | |

| | | |
|---|---|---|
| | : | |
| **HAZAMI BARMADA** | : | |
| **Petitioner,** | : | **Case No. 2024 ASO 452** |
| **v.** | : | |
| | : | **Judge John McCabe** |
| **SHMUEL HERZFELD** | : | |
| **Respondent** | : | |

### ORDER DENYING SPECIAL MOTION TO DISMISS AS MOOT BUT REQUIRING PETITIONERS TO PAY THE COSTS AND ATTORNEYS' FEES OF RESPONDENT AND ENTERING JUDGMENT AGAINST PETITIONERS FOR RESPONDENT'S COSTS AND ATTORNEYS' FEES

On May 7, 2024, Petitions for an Anti-Stalking Order were filed by Atefeh Rokhvand and Hazami Barmada ("Petitioners") alleging that Shmuel Herzfeld ("Respondent") had stalked them. On May 21, 2024, both cases were continued to June 11, 2024. Joint hearings were held in the two cases as they were related. The trial was held on June 11, July 1, and July 26, 2024. On July 26, 2024, the Court denied both petitions. Petitioners were represented by attorneys Sam Burgan and Asim Humayun. Respondent was represented by attorneys Robert Parker, Steven Lieberman, and Nicole DeAbrantes.

On May 20, 2024, Respondent filed a Motion to Dismiss Petitions for Anti-Stalking Orders and Motion Pursuant to D.C. Code § 16-1063(f) for Termination of Temporary Anti-Stalking Orders (the "Motion to Dismiss"). On June 8, 2024, Petitioners filed an opposition to the Motion to Dismiss.

1

On June 27, 2024, Respondent filed a Special Motion to Dismiss Pursuant to the District of Columbia's Anti-SLAPP Statue (the "Special Motion to Dismiss"). The Anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") Act is set forth in D.C. Code § 16-5501 - 5505. On July 1, 2024, Petitioners filed an opposition to the Special Motion to Dismiss. On July 5, 2024, Respondent filed a reply to Petitioners' opposition to the Special Motion to Dismiss.

At the hearing on June 11, 2024 the Court stated that it could not rule on the Motion to Dismiss without hearing the evidence presented in the cases. Likewise, at the hearing on July 1, 2024, the Court stated that it could not rule on the Special Motion to Dismiss without hearing the rest of the evidence in the cases.[1]

With regard to the Special Motion to Dismiss, the Court received an e-mail from Respondent's counsel on July 31, 2024, inquiring on the status of that motion and an e-mail from Petitioners' counsel in response. In his e-mail, Respondent's counsel asserted that the Special Motion to Dismiss was not moot even though Respondent prevailed at trial. However, Respondent's counsel did not specify what relief he sought from the Court, given that the trial had concluded.

As noted above, on July 26, 2024, the Court denied both petitions. However, the Court neglected to rule on the Motion to Dismiss or the Special Motion to Dismiss at that time. By Order dated August 16, 2024, this Court issued an Order Denying Motion to Dismiss as Moot and Requesting Further Pleading Regarding Special Motion to Dismiss. As set forth in its August 16, 2024 Order, this Court requested further pleading regarding the Special Motion to Dismiss to clarify what relief the Respondent was seeking given that he had prevailed at trial and any motion to dismiss would likely be moot.

---

[1] As noted above, evidence was presented on June 11, July 1, and July 26, 2024.

In response to the Court's August 16, 2024 Order, on September 6, 2024, Respondent filed a Supplemental Pleading in Support of His Special Motion to Dismiss Pursuant to the District of Columbia's Anti-SLAPP Statute, along with a Declaration by Respondent's counsel regarding the amount of costs and attorneys' fees being sought.  On September 28, 2024, Petitioners filed a Response to Respondent's Supplemental Pleading in Support of His Special Motion to Dismiss Pursuant to the District of Columbia's Anti-SLAPP Statute.  On October 9, 2024, Respondent filed his Reply Brief in Support of his Supplemental Pleading in Support of His Special Motion to Dismiss Pursuant to the District of Columbia's Anti-SLAPP Statute.

For the reasons set forth herein, the Court will deny the Special Motion to Dismiss as the Court concludes that since the Respondent has prevailed at trial, any pretrial motions to dismiss are moot.  However, for the reasons asserted by Respondent in the Special Motion to Dismiss and the supplemental pleadings filed in support thereof, the Court will order that the Petitioners pay the amount of costs and fees sought by Respondent.

## FACTUAL AND PROCEDURAL BACKGROUND

The trial in these matters occurred on June 11, July 1 and July 26, 2024.  As the Court stated on July 26, 2024 in announcing its ruling in favor of the Respondent, most of the relevant facts were not in dispute.  The parties differed primarily on the question of law – whether the facts proved amounted to stalking under D.C. Code §§ 22-3131-35.

All of the relevant events in the case occurred near the location of the Israeli embassy in Northwest DC.  In late February of 2024, many individuals, including Petitioners, began a protest of the actions of the Israeli government in Gaza.[2]  The Israeli embassy is located at 3514 International Dr. NW, near the intersection of International Dr. and Van Ness St. NW (in the

---

[2] Protests had begun prior to February 2024; however, more people became involved in the protests following a tragic incident that month when a man protesting at the embassy died after setting himself on fire.

southwest quadrant of that intersection (south of Van Ness St. and on the west side of International Dr.). There was some protest activity on both International Drive and Van Ness St. All of the activity occurred either on public sidewalks or on those streets. As of the end of the trial on July 26, 2024, the protests were still ongoing. While the number of people present varied, there was some type of protest in place 24 hours per day. Law enforcement officers from either the United States Secret Service or the Metropolitan Police Department were present throughout the protests.[3] Some individuals carried signs and there were signs hanging at locations near the protest. At times, protesters used microphones, speakers and megaphones while stating the reasons for the protest. Ear plugs were available at the location of the protest. A decibel reader was also kept in the area in an effort to ensure compliance with any noise regulations. Individuals who wished to indicate support for the protesters or assist with the protest were provided with red vests.

There was no evidence presented at trial that any of the individuals protesting the actions of Israel were arrested for any illegal activity. However, on July 3, 2024, Ezra Weinblatt pled guilty in case 2024 CMD 3719 to damaging property of Petitioner Barmada (the incident occurred on April 16, 2024 in front of the Israeli embassy). Mr. Weinblatt picked up speakers, microphones and a megaphone belonging to Ms. Barmada and threw them into the street, causing damage to the items.

Petitioner Hazami Barmada is 40 years old. She received an MPA degree from Harvard University's Kennedy School and has worked at the Aspen Institute. She hosts a podcast and participated in many protests prior to the one at the Israeli embassy in 2024. She stated that she sometimes protested at the home of (now former) U.S. Secretary of State Anthony Blinken in northern Virginia, at times throwing fake blood in the direction of motor vehicles entering or

---

[3] The Secret Service officers were present at the embassy on International Drive while the Metropolitan Police Department officers usually were on Van Ness St.

exiting his home. She maintains an active social media presence and has been interviewed by media on many occasions in connection with her protest activities. No evidence was presented that Ms. Barmada has been arrested or charged with any illegal activity in connection with her protests. Furthermore, the Court did not find any basis for concluding that Ms. Barmada's protest activity was illegal; however, the Court does believe that her extensive experience in protest activity is relevant to the issues in this case.

Petitioner Atefeh Rokhvand is 43 years old and has worked as a teacher and school principal and has assisted in resettlement of refugees. Like Ms. Barmada, Ms. Rokhvand has participated in numerous protests. She has thrown fake blood in the direction of motor vehicles while yelling that individuals that they were war criminals or baby killers. A video of Ms. Rokhvand engaging in such activity at the Israeli embassy was admitted into evidence. Ms. Rokhvand also posts on social media about her protest activity.

Ms. Barmada and Ms. Rokhvand were clearly leaders of the protests at the Israeli embassy.[4] The Special Motion to Dismiss sets forth in more detail some of their activities and their attempts to publicize their opposition to the actions of Israel in Gaza. As this Court asserted on numerous occasions at hearings in these matters, it is not the job of this Court to make any judgments (and the Court does not make any such judgments) on the actions of Israel in Gaza or the righteousness of the views of the protesters. Furthermore, the Court is not called to determine the propriety of the protest activity of the Petitioners; as noted above, the Court finds no basis to conclude that Petitioners engaged in any illegal activity in connection with their protest. The Court believes, however, that the substantial experience of the Petitioners in protest activity is relevant to its determination of whether to require them to pay the costs and fees of the Respondent.

---

[4] Fellow protesters sometimes described Petitioner Barmada as their "leader" and Petitioner Rokhvand as their "governor."

Respondent Shmuel Herzfeld has been a rabbi since 1999. He has worked in the DC area since 2004. He hosts a podcast and has written seven books. He was present at the Israeli embassy on March 21, May 2 and May 7, 2024.

On May 1, 2024, Respondent filed a civil lawsuit in the United States District Court for the District of Columbia against Petitioners and others, alleging, *inter alia*, that on March 21, 2024, while present at the Israeli embassy, his hearing was injured because of the loud noise made by protesters and because he was subject to hate speech. At page 3 of their June 8, 2024 Opposition to the Respondent's Motion to Dismiss, Petitioners assert that Respondent may have filed his lawsuit in federal court in an effort to avoid having his complaint dismissed under the District of Columbia's Anti-SLAPP statute.[5]

As an exhibit to their Opposition to Respondent's Motion to Dismiss, Petitioners attached a copy of the Motion to Dismiss filed by their counsel in connection with Respondent's federal lawsuit.[6] In the federal court Motion to Dismiss, where Petitioners herein are named as Defendants, Petitioners assert very similar arguments to those of the Respondent in the instant DC Superior Court case. Namely, that the Petitioners (Defendants in the federal court case) were engaged in constitutionally protected activity and that the lawsuit by the Respondent (Plaintiff in the federal court case) was brought for an improper purpose. Page 6 of the federal court Motion to Dismiss filed by Petitioners (Defendants in federal court) contains the following language:

> Protest, picketing, and other similar activities lie at the core of free speech guaranteed by the First Amendment. Public streets and sidewalks are open areas for peaceful protest . . . Mr. Herzfeld yelled at the protesters as he is entitled to do . . . Mr. Herzfeld has obtained significant press coverage for his efforts, including this lawsuit. The Gaza war is an important matter of public

---

[5] The Court notes that the following cases indicate that the Anti-SLAPP statute <u>does</u> apply to federal court cases. See *Forras v. Rauf*, 39 F. Supp. 3d 45; *Boley v. Atl. Monthly Group*, 950 F. Supp. 2d 249; *Abbas v. Foreign Policy Group LLC*, 975 F. Supp. 2d 1.

[6] Petitioners were represented by different counsel at the time the motion to dismiss was filed in the federal court case.

interest . . . But peaceful protests, even if noisy, are not a matter for lawsuits. This lawsuit, if it were to go forward, would have a chilling effect on the protected activities of not just the Gaza protest, but of other protests as well, or just lead to an expanding circle of counterclaims and third party claims.

The prediction by Petitioners of an "expanding circle of counterclaims" is exactly what happened between the parties herein.  On May 8, 2024, one week after the Respondent filed his federal court lawsuit, Petitioners filed their respective Anti-Stalking petitions.[7]

## SPECIFIC ALLEGATIONS OF STALKING

It was uncontested that the Respondent never had any interaction with either of the Petitioners except on March 21, May 2 and May 7, 2024 at the location of the Israeli embassy.  On March 21, 2024, Ms. Rokhvand was not present; the only two days on which she and the Respondent were  both at the embassy were May 2 and 7, 2024.  The Respondent and Ms. Barmada were present on all three days.  Other than on those three dates, there was no interaction between the Respondent and either Petitioner.   There was no evidence that the Respondent tried to communicate to either Petitioner in writing, by phone, by e-mail or test message.  Therefore, any claim of stalking was based upon the events of March 21, May 2 and May 7, 2024.[8]

---

[7] It is the Court's understanding that one or both of the Petitioners/Defendants were served with process in the federal court case on May 7, 2024 and filed the petitions herein the following day.  As noted above, the federal court Motion to Dismiss was filed May 20, 2024.  It is not clear if federal court counsel were aware that the Petitioners had filed Anti-Stalking petitions on May 8, 2024.  The petitions were filed *pro se*; counsel in this Superior Court case first appeared at the May 21, 2024 hearing.

[8] During the trial, Petitioners presented as an exhibit a Fox News story about the Respondent's federal court lawsuit.  The Petitioners did not allege in either of their petitions that the Respondent's speaking with Fox News reporters constituted an act of stalking.  However, at trial they suggested that his doing so was part of the pattern of stalking by Respondent and that he was acting in a manner that placed their safety at risk.  The Court notes that nothing in the article indicates that the Respondent mentioned the names of the Petitioners or their contact information.  The reporter was able to get the names of the Petitioners from the federal court lawsuit.  The Petitioners themselves listed their addresses in their petitions in the instant DC Superior Court case, even though petitioners are able to keep their address confidential pursuant to Domestic Violence Rule 3(b)(3).  Given the extensive publicity that Petitioners have brought to their protest activities, including by their filing of the anti-stalking petitions herein, any suggestion that somehow the Respondent was primarily responsible for calling attention to their identities is without merit.  Furthermore, the activities of Petitioners and Respondent in connection with the protests is clearly constitutionally protected activity, as Petitioners themselves assert in their motion to dismiss the federal court lawsuit filed by Respondent.  The case of *Marshaud v. Boone*, 295 A.3d 1139 (D.C. 2023) discusses at length the First Amendment protections applicable in stalking cases.

**March 21, 2024**

On March 21, 2024, the Respondent went to the Israeli embassy accompanied by a group of about 4 or 5 other men (including Mr. Parker and Mr. Lieberman, two of the attorneys representing the Respondent herein).  Video recordings of his activities that day were submitted into evidence.  The Respondent initially began to say some prayers while standing on the sidewalk facing the embassy.  Petitioner Barmada and several other protesters were also on the sidewalk nearby.  Petitioner Barmada was wearing headphones and had a megaphone in her hands.  Some other protesters held flags less than a foot away from Respondent while he was praying.  At some point, Respondent made reference to the protesters, stating that they were wicked people for supporting Hamas and that Israel would defeat them.   Petitioner Barmada addressed the Respondent and those with him by saying that they looked "like Nazis," that they were "celebrating terror, asked if they were "proud of terrorizing children," and said that the presence of the Respondent and those with him was "hilarious."   These statements were amplified by the megaphone being used by Petitioner Barmada.  In addition, at one point Petitioner Barmada said that it was time for "the sirens," and then the loud sound of sirens was heard.

The activities of Respondent on March 21, 2024 were constitutionally protected activities, as were those of Petitioner Barmada – as her own attorneys in the federal court lawsuit correctly assert in their motion to dismiss that suit.  Both were engaged in a protest regarding a matter of significant public interest.  The District of Columbia's Anti-Stalking statute "does not apply to constitutionally protected activity."  D.C. Code § 22-3133(b).

Furthermore, stalking requires evidence that the offender's conduct was "directed at a specific individual."   D.C. Code § 22-3133(a).   The only time that Respondent appeared to be

engaging with Petitioner Barmada specifically was when she said that inhumanity by anyone was wrong, and the Respondent <u>agreed with her</u>, saying, "that's true."

It is clear that the activities of the Respondent on March 21, 2024 did not come close to being an incident of stalking of Petitioner Barmada (nor of Petitioner Rokhvand, who wasn't even present that day).  He was engaged in constitutionally protected activity on a public sidewalk. Other than his agreeing with Petitioner that inhumanity was wrong, his conduct was clearly not directed at her in particular.  Finally, Petitioner Barmada's conduct in drowning out much of what Respondent said with her own amplified comments and her remark that Respondent and his companions were "hilarious" belies any claim that the Respondent's activities on that date caused Petitioner Barmada the type of significant distress required by the anti-stalking statute.  D.C. Code § 22-3133(a).[9]

**May 2, 2024**

Video of the events of May 2, 2024, was also admitted into evidence.  Respondent was in the front passenger seat of a car driving slowly on Van Ness St. near the corner of International Drive.[10]  Respondent's window was initially up but then it rolled down and he asked "why do you support the raping of innocent women?"  The window then rolls back up and the car continues down the street.  The Court credits the testimony of Petitioners that they were on the sidewalk on Van Ness St. and that Respondent's question appeared to be directed toward them.

As with the events of March 21, 2024, the actions of Respondent on May 2, 2024 do not come close to being an incident of stalking activity.  The Petitioners may very well have been offended by what the Respondent said on May 2, just as the Respondent was likely offended when

---

[9] As noted above, law enforcement officers from the Secret Service and the Metropolitan Police Department were present at all times at the location of the protests.
[10] As discussed above, there were protesters and signs on both International Drive and Van Ness St.

Petitioner Barmada called him a Nazi and a supporter of terrorizing children on March 21, 2024. However, as Petitioner's own attorneys asserted in their motion to dismiss the federal court case, these comments, while offensive, are constitutionally protected.[11]

**May 7, 2024**

Video of the events of May 7, 2024, was also admitted into evidence.  On that date, Respondent and another individual were on the sidewalk on the north side of Van Ness St. NW, near the intersection with International Drive.  While the Court credits the testimony of Petitioners that they were both present in that area on May 7, 2024, no evidence was presented that the Respondent had any interaction with either Petitioner that day.  Ms. Rokhvand was on the south side of Van Ness St; across the street from the Respondent.[12]  A large container was present on the north side of Van Ness St.  There were signs saying that ear plugs were in the container and that people were welcome to use them given that the protests sometimes produced loud noise. Petitioner Rokhvand asserted in her petition that Respondent "went through my stuff."  The video shows that no one besides the Respondent and the man with him were near the basket of ear plugs which were on a public sidewalk and had signs inviting people to use the ear plugs.  Furthermore, there is no evidence that the Respondent took any of the ear plugs; he simply directed his companion to take photographs of the basket of ear plugs.[13]

---

[11] As the Court asserted several times during the trial, it was not its job to determine whether either side had a particular factual basis for their sometimes offensive comments.  The Court therefore did not permit Respondent's counsel to attempt to present evidence regarding the basis for his belief that Hamas had engaged in sexual assault.

[12] On that date, Richard Pollak, who had accompanied the Respondent to the area of the protest, walked up to Petitioner Rokhvand and spoke to her about his views on the situation in Gaza.  As this Court found in denying Petitioner Rokhvand's anti-stalking petition against Mr. Pollak in case number 2024 ASO 490, Mr. Pollak's comments, while likely offensive, were constitutionally protected.  More importantly, Respondent himself did not approach either Petitioner or attempt to speak to either of them on May 7, 2024.

[13] It seems quite possible that the Respondent was documenting the presence of ear plugs in support of his claim in his federal court lawsuit that the Petitioners knew that they were producing loud noises in their protest.  Even if he was attempting to procure evidence to support his federal court lawsuit, his conduct in pointing to a basket of ear plugs (with no one in the vicinity of such ear plugs), does not come close to stalking conduct, particularly since he had no interaction at all with either Petitioner that day.  This would be true even if the basket of ear plugs was not near a protest site.

**Respondent's Conduct Clearly Did Not Constitute Stalking**

The crime of stalking requires that the accused has engaged in a course of conduct on two or more occasions. D.C. Code § 22-3132(8). There are 3 forms that such conduct may entail. Id. Section 22-3132(8)(B), interfering with, damaging or taking the victim's property, clearly does not apply in this case. As discussed above, there is no evidence that the Respondent engaged in any such behavior. While Respondent pointed to a basket of ear plugs on May 7, 2024, there is no evidence that he took or damaged any property. Furthermore, no one was in the immediate vicinity of the basket, which was on a public sidewalk and contained an invitation to use the ear plugs.

There was also no evidence to support an allegation that the Respondent used the personal information of the Petitioners, which is another of the three examples of a course of conduct of stalking. D.C. Code § 22-3132(8)(C).

Therefore, the only basis for any allegation of stalking would be D.C. Code § 22-3132(8)(A), which provides that following, monitoring, placing under surveillance, threatening or communicating to or about the victim may be examples of stalking activity. As discussed above, there is no evidence that Respondent ever threatened the Petitioners. There is no evidence that he ever followed, monitored or placed them under surveillance. The only times he ever saw them was at the location of the protests on three occasions (only two with regard to Ms. Rokhvand). The evidence suggests that his presence on those occasions was not an attempt to locate Petitioners or any other particular individuals; he was going to the embassy to pray, observe the protests and at times (March 21 and May 2) make his own comments regarding the protests.[14]

---

[14] As discussed above, his participation in an interview with Fox News was not an incident of stalking activity. There was no evidence that he even mentioned the names of the Petitioners to Fox News (and the Petitioners

**ANTI-SLAPP STATUTE**

Respondent requests that the Court order the Petitioners to pay his costs and attorneys' fees pursuant to the District of Columbia's Anti-SLAPP statute. D.C. Code § 16-5501-5505. Specifically, D.C. Code § 16-5504 provides that a court "may award a moving party who prevails, in whole or in part, on a motion brought under D.C. Code § 16-5502 or § 5503, the costs of litigation, including reasonable attorney fees." A litigant may file a "special motion to dismiss" a claim "arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim." D.C. Code § 16-5502(a).

As noted above, Respondent filed his Special Motion to Dismiss on June 27, 2024. He asserts that he was served on May 17, 2024. His Special Motion to Dismiss was therefore timely as it was filed 41 days after he was served.

The Court also concludes that the actions of the Respondent at the Israeli embassy were clearly "acts in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5501(1). As noted above, the Petitioners do not appear to dispute this. In their federal court motion to dismiss, they suggested that Respondent's lawsuit runs afoul of the Anti-SLAPP Act.

The Petitioners assert that this Court cannot award attorney's fees to Respondent because his Special Motion to Dismiss is moot since the Court denied both petitions after trial. The Court agrees with Petitioners that it would be procedurally inaccurate to state that it was granting a pretrial motion to dismiss (either the initial Motion to Dismiss filed May 20, 2024 or the Special Motion to Dismiss filed June 27, 2024) when trial had been completed and the Court had found in favor of Respondent on the evidence presented at trial. Once the trial was completed and the Court ruled in favor of the Respondent, any pretrial motions to dismiss by Respondent were moot.

---

voluntarily made a statement to Fox News regarding the allegations in the federal court lawsuit). More importantly, all of this was constitutionally protected activity.

However, the Court finds that the award of costs and attorneys' fees to Respondent is appropriate in this case under the Anti-SLAPP Act even though the Court never ruled on the Special Motion to Dismiss.[15]  In *Jacobson v. Clack*, 309 A.3d 571 (D.C. 2024), the awarding of attorneys' fees was upheld even though the Plaintiff had voluntarily withdrawn his complaint prior to the judge ruling on the special motion to dismiss.  Similarly, this Court concludes that attorneys' fees may be awarded even though the Court determined that it could not rule on the Special Motion to Dismiss without hearing the evidence.

The Court believes its ruling herein is consistent with the purpose of the Anti-SLAPP Act. Section 16-5502(d) states that a hearing on a special motion to dismiss should be held on an expedited basis (i.e. prior to trial).  However, this Court concluded that any hearing on a special motion to dismiss would likely take just as long as a trial, given that trials in Anti-Stalking cases are generally not lengthy.[16]

The purpose of the Anti-SLAPP Act is to discourage "lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view."  *Jacobson*, 309 A.3d at 577, quoting from D.C. Council hearings on the legislation. Petitioners requested Temporary Anti-Stalking Orders ("TASO's") prohibiting the Respondent from being in certain areas of the District of Columbia.  TASO's were granted at various stages of these proceedings - on May 8, May 21, June 11, and July 1, 2024.  While the Petitioners did not

---

[15] As discussed below, the Court also finds that attorneys' fees and costs should be awarded as a general exception to the American Rule, given the frivolous nature of the allegations of Petitioners.

[16] Discovery is generally stayed while a special motion to dismiss is pending.  However, in contrast to general civil cases, such as those alleging defamation, discovery is rarely done in cases in the Domestic Violence Division of D.C. Superior Court.  In fact, discovery is not even permitted without permission of the court given the summary nature of the proceedings.  Domestic Violence Rule 8.  The Court notes that the Domestic Violence Rules clearly apply to petitions for a civil protection order under D.C. Code §§ 16-1001 to 1005 (DV Rule 1).  The statutory provisions regarding Anti-Stalking Orders D.C. Code §§ 16-1061 to 1065, were passed in 2021, and the Domestic Violence Rules have not been updated since that time.  However, it is the practice of judicial officers to apply the DV Division Rules to Anti-Stalking cases as well as Civil Protection Order cases; in other words, discovery is not permitted without prior authorization of the court.

request that the Court prohibit the Respondent from participating in activities regarding Israel's actions in Gaza, they did request that he be prohibited from being in certain areas of the city and that he be required to be a certain distance from the Petitioners.

It is clear that the filing of the ASO Petitions in these cases was aimed to limit the Respondent's ability to participate in activities of public interest – his only connection to the Petitioners was that they had both been at the site of protests at the Israeli embassy. However, the Court determined that it was unable to rule on either the Motion to Dismiss or the Special Motion to Dismiss without hearing evidence of the events of March 21, May 2 and May 7, 2024. While it was clear to the Court prior to trial that activities of the Respondent at the Israeli embassy were likely constitutionally protected, it could not determine whether any of such activities constituted stalking without hearing the evidence. Not all activities by participants in protests are constitutionally protected. As noted above, Ezra Weinblatt was found guilty of destruction of property and assault in case 2024 CMD 3719 (and Ms. Barmada herself was the victim of the property destruction offense) even though his actions also took place in connection with his presence at the Israeli embassy at the time of the protests. When Petitioner Rockhvand asserted in her petition that Respondent "went through her stuff," it was unclear to the Court if she was alleging that he took or damaged any of her property until the evidence was presented at trial. It was only after trial that the Court was able to clearly see that the "stuff" that Petitioner referred to was in a basket with no one nearby (thus not at all clear that these items were the property of Petitioner Rokhvand) with a sign inviting people to use the ear plugs. Furthermore, the Respondent did not in any way damage or take any of ear plugs.

Similarly, Petitioner Barmada's description in her petition of the events of March 21 did not accurately describe what had occurred. It was only upon observing the video evidence that the

14

Court was able to clearly see that the Respondent's activities were not even directed at the Petitioner in particular (other than his agreeing with her that inhumanity is awful no matter who is to blame), that Petitioner Barmada and her fellow protesters were far louder and more confrontational than Respondent, and that Petitioner Barmada was not in any way intimidated by the Respondent as she remarked about how "hilarious" he and his companions were while speaking into a megaphone.[17]

As discussed above, the Petitioners participated in protests prior to the ones that are the subject of these cases. Their testimony made clear that they are quite familiar with the type of activity that is constitutionally protected.[18] Their own attorneys argued in federal court that the Respondent's lawsuit should be dismissed because the activities at the protests were constitutionally protected. Furthermore, prior to trial, this Court told Petitioners and their counsel that it had read the Motion to Dismiss filed by Respondent on May 20, 2024[19] and was skeptical that the allegations of Petitioners were sufficient to establish stalking.[20]

For all of the above reasons, the Court concludes that the two ASO petitions filed herein are clearly the type that should be discouraged under the anti-SLAPP Act.[21] The Court further

---

[17] As stated above, the Court does not make any determination as to the righteousness of the beliefs of either the Petitioners or the Respondent, nor does the Court suggest that Petitioner Barmada's activities were not also constitutionally protected. It may be that the Respondent's federal court lawsuit may also be unsuccessful for similar reasons. The Court only addresses the specifics of the events of March 21, including the actions of Petitioner Barmada because it was only by seeing the evidence at trial that the Court was able to see that the allegations of Petitioners were clearly not even close to a claim of stalking.

[18] For example, Petitioner Barmada stated that she was aware that throwing fake or symbolic blood was different than throwing actual blood.

[19] As noted above, the Special Motion to Dismiss was filed June 27, 2024.

[20] In their Special Motion to Dismiss, Respondent asserts that Petitioners were "limited purpose public figures,", citing *Doe v. Burke*, 91 A.3d 1031 (D.C. 2014). Petitioners did not address this assertion in their pleadings, and the Court agrees with Respondent that Petitioners were "limited purpose public figures." However, the Court also notes that the instant cases involve allegations of stalking, not defamation as in *Doe v. Burke*. The Court therefore believes that while the Petitioners' status as "limited purpose public figures" would be relevant if they were charging the Respondent with defamation, it is of limited relevance in a stalking case. However, as discussed herein, the experience of Petitioners in numerous protest activities is relevant to a determination as to the award of fees and costs to Respondent.

[21] Even though remote hearings are now commonplace in the Domestic Violence Division, the parties in these cases and their attorneys appeared in person in courtroom 113 throughout these proceedings. Numerous individuals

concludes that attorneys' fees may be awarded under the Act even after trial.  To rule otherwise would run counter to the purposes of the Act.  The procedures set forth in the Anti-SLAPP Act provide that a plaintiff may defeat a special motion to dismiss by demonstrating a likelihood of success on the merits.   In this case, a hearing on the Respondent's Special Motion to Dismiss would have been virtually identical to the trial that took place.  The award of attorney's fees is appropriate whether the evidentiary hearing conducted in this case had been considered a hearing on the Special Motion to Dismiss or a trial on the merits.  To argue, as Petitioners do, that attorney's fees are not awardable because the evidentiary hearing held in this case was called a trial (as opposed  to hear hearing on the Special Motion to Dismiss) is to place form over substance and to ignore the clear purpose of the Anti-SLAPP Act.[22]

## ATTORNEYS' FEES ARE ALSO AWARDABLE AS AN EXCEPTION TO THE AMERICAN RULE

The Court also concludes that the Petitioners shall be ordered to attorney's fees and costs as an exception to the "American Rule" because the "interests of justice so require."  *Logan Real Est., LLC v. District of Columbia*, 311 A.3d 893, 898 (D.C. 2024), quoting *Cathedral Ave. Coop., Inc. v. Carter*, 947 A.2d 1143, 1159 (D.C. 2008).  The Court concludes that the petitions filed

---

observed the proceedings either in person or through the WebEx application.  This is very unusual for proceedings in the Domestic Violence Division of this court.  The views of the observers were apparent as some identified themselves as "supporters" of the Petitioners or the Respondent on the WebEx application.  Others attempted to bring signs into courtroom.  The Court announced during the trial that all observers were welcome (unless they would be called to testify).  There was nothing wrong with any of the parties asking others to observe the proceedings – however, the presence of so many individuals and their identification with one side or the other are another indication of the fact that the issues regarding activities in Gaza were of great public interest (even though the Court's decision would not in any way depend upon the view of the parties on such issues).

[22] Petitioners correctly note that D.C. Code § 16-1064(c)(4) provides that a court may award attorney's fees to a petitioner if the petitioner prevails at trial on a petition for an anti-stalking order.  They also correctly note that the Anti-Stalking Statute does not have a provision authorizing the award of fees to a respondent.  They then argue that awarding attorney's fees to a respondent would be contrary to the purposes of that statute.  This Court disagrees.  Indeed, the award of attorney's fees is appropriate as an exercise of a court's "equitable power" even in the absence of specific statutory authority.  *Logan*, supra, 311 A.3d at 898.  The award of attorney's fees to a respondent when a petitioner has filed a frivolous anti-stalking claim does not in any manner conflict with the award of attorney's fees to a different petitioner whose claim is meritorious.

16

herein "had no basis whatever in the evidence to support it and was [clearly] brought for coercive purposes." *Logan*, 311 A.3d at 898, <u>quoting</u> *Yeh v. Hnath*, 294 A.3d 1081 at 1089-90 (D.C. 2023). As discussed above, none of the three incidents alleged in the petitions came close to incidents of stalking behavior by the Respondent.  On March 21, 2024, Petitioner Rokhvand was not even present.  Petitioner Barmada was present, but Respondent did not in any way monitor, surveil or threaten her.  His statements about the situation in Gaza clearly were not directed at Petitioner Barmada in particular.[23]  His only interaction directly with her came when he agreed with her that inhumanity by anyone is wrong.  The video evidence shows that Petitioner Barmada was not in any manner intimidated by the actions of Respondent or the others with him; she used a megaphone to state that the Respondent and those in her group were Nazis and "hilarious."

As to the events of May 2, 2024, there was no evidence that Respondent had any interaction with Petitioner Barmada.  His sole interaction with Petitioner Rokhvand was asking why she supported sexual assaults on women.  As discussed above, both Petitioners have participated in protests on many prior occasions; as such, they are clearly aware that the question asked by Respondent, while likely offensive, is clearly constitutionally protected.[24]

It does not appear that Respondent had any interaction with either Petitioner on May 7, 2024.  He simply walked on Van Ness St. NW and pointed at a basket of ear plugs.

The Court also notes that the petitions herein were filed right after the Petitioners were served with notice of the Respondent's federal court lawsuit against them.  In addition, at the

---

[23] As stated above, stalking behavior involves conduct that is "directed at a specific individual"  D.C. Code § 22-3133(a).

[24] As discussed above, evidence was presented at trial that Petitioners have thrown fake blood at individuals coming and going from the Israeli embassy and yelled that such individuals are war criminals.  Indeed, Petitioner Barmada's reference to a rabbi as a "Nazi" on March 21, 2024 was likely quite offensive to Respondent; however, such a statement is constitutionally protected.  Furthermore, as noted above, in their motion to dismiss the federal court lawsuit that was filed against them by Respondent, they specifically acknowledged that the activities of the Respondent were constitutionally protected.

hearing on May 21, 2024, this Court admonished Petitioners and their counsel to review the stalking statute and cases interpreting it because it appeared that the allegations might not be sufficient to make a case for the crime of stalking.[25]

For all of these reasons, the Court concludes that the "bad faith" exception to the American Rule applies in this case as it believes that the filing and the maintaining of the petitions in these two cases was brought for "coercive purposes" – to interfere with the Respondent's constitutionally protected right to go to the site of the protests at the Israeli embassy.[26]

## AMOUNT OF COSTS AND FEES

Respondent requests that the Court order Petitioners so pay the sum of $ 181,526. While this is clearly a substantial sum, the Court finds no basis to reduce it.

The Court notes that the determination of reasonable attorney fees "'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Furthermore, "the trial court is not required to perform an in-depth analysis of the billing records." *Lively v. Flexible Packaging Ass'n,* 930 A.2d 984, 993 (D.C. 2007). In reviewing the prevailing party's billing records, "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838. "A review for 'reasonableness' is not *carte blanche* for micromanaging the practice of lawyers the court … has no reason to believe are padding their hours." *Tenants of 710 Jefferson St. v. D.C. Rental Housing Comm'n*,

---

[25] As discussed above, there was no evidence that the Respondent ever tried to follow, monitor or surveil the Petitioners. There was no evidence that he phoned them or sent e-mails or text messages to them. The only time he had any contact with them was at the protests at the Israeli embassy.

[26] The Petitioners each testified that they have substantial fears for their safety. As discussed above, Petitioners were leaders of protests at the Israeli embassy for a period of months, and they actively publicized their protest activity. There are sadly many individuals who might attempt violence towards someone who has engaged in such constitutionally protected activities. Indeed, calling attention to the actions of individuals such as former Secretary of State Blinken (as Petitioners did) might increase the chance that he would be a victim of violence; however, going to his home and calling him a war criminal is constitutionally protected activity. In contrast, Respondent's actions did not even target Petitioners individually and there is thus no basis to conclude that the fear that Petitioners may very well have experienced can logically be connected to his activities.

123 A.3d 170, 191 (D.C. 2015). "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838.

Respondent provided a detailed listing of the hours spent on the case and the work performed, as well as an explanation of the hourly rates of those who worked on the case, citing the Laffey Matrix. The Court notes that the work of counsel for Respondent included not just the four days of court hearings (May 21, June 11, July 1 and July 26, 2024), but the filing of a pretrial motion to dismiss and a special motion to dismiss as well as post-trial motions regarding the issue of attorney's fees. The Court has no basis to disagree with the assertion that the Respondent has already reduced the requested fee by not billing for paralegal work (which amounted to about $ 25,000) and further reduced the bill of the attorneys by 20 %. The Court finds no reason to reduce the award any further.

## CONCLUSION

On May 1, 2024, the Respondent herein filed a lawsuit against Petitioners in United States District Court.[27] A week later, after being served with notice of the federal lawsuit, Petitioners filed anti-stalking petitions against Respondent. None of the three incidents set forth in the Petitions comes close to stating a basis that Respondent committed the crime of stalking. The Petitioners are experienced protestors and were very much aware that the actions of the Respondent at the Israeli embassy were constitutionally protected, as they asserted in their motion to dismiss his claims against them in federal court.[28] Frivolous claims of stalking such as those of Petitioners herein are exactly the kind that the Anti-SLAPP Act is designed to discourage. Furthermore, such

---

[27] The claims against Petitioner Rokhvand were later dismissed as she was not present at the Israeli embassy on March 21, 2024.

[28] As noted above, it is possible that some or all of the Respondent's claims in his federal case will be dismissed and/or denied for similar reasons.

claims are grounds for an exception to the "American Rule" that parties each pay their own fees and costs.

        **WHEREFORE**, it is by the Court this 18th day of February, 2025, hereby

        **ORDERED**, that the Special Motion to Dismiss filed by Respondent on June 27, 2024 is hereby **DENIED AS MOOT**; and it is further

        **ORDERED** that Petitioners shall pay the costs and attorney's fees of the Respondent; and it is further

        **ORDERED** that judgment in the amount of **$ 181,526** is hereby entered in favor of Respondent Shmuel Herzfeld and against Petitioners Atefeh Rokhvand and Hazami Barmada, jointly and severally.

                              **Judge John McCabe**
                              **Associate Judge**

Copies to:

  Sam Burgan, Esq.
  Asim Humayun, Esq.
  *Via Email*
  *Counsel for Petitioners*

  Robert Parker, Esq.
  Steven Lieberman, Esq.
  Nicole DeAbrantes, Esq.
  *Via Email*
  *Counsel for Respondent*