**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHMUEL HERZFELD,

        *Plaintiff*,

    v.

HAZAMI BARMADA et al.,

        *Defendants*.

Civil Action No. 24-1272 (TJK)

**<u>MEMORANDUM OPINION</u>**

About half a year after Hamas's October 2023 attack on Israel, a crowd of pro-Palestinian protestors was using speakers and bullhorns outside the Israeli embassy in Washington, D.C. Upon arriving there, Rabbi Shmuel Herzfeld positioned himself in that same area and led a small group to offer prayers for, among others, hostages held by Hamas. And as soon as Rabbi Herzfeld began praying among them, he alleges that one of their leaders—Hazami Barmada—told the protestors to get louder by using sirens. After praying for a few minutes amid the noise, Rabbi Herzfeld left the area.

Soon after, Rabbi Herzfeld sued Barmada and another purported leader of the protestors— Atefeh Rokhvand, who was not at the embassy that day. In his amended complaint, he presses five claims based on physical and emotional harm that he says he suffered because of the alleged sonic attack that the two orchestrated. But try as he might, Rabbi Herzfeld has not alleged facts permitting recovery in tort or under the D.C. Code for voluntarily entering a group of protesters wielding sound-amplifying devices. His claims for assault and battery falter because, even if causing soundwaves to contact someone (or causing a person to fear such contact) can support assault or battery liability—a novel proposition—Rabbi Herzfeld manifested consent to the conduct that

he says caused the soundwaves to strike him. Nor has he alleged the requisite outrageous conduct or emotional suffering for the tort of intentional infliction of emotional distress. The statutory claim, moreover, fails because Rabbi Herzfeld has not alleged that Barmada and Rokhvand committed a criminal act demonstrating their prejudice against him. And those defects are the end of the road for the civil-conspiracy claim, a theory of vicarious liability lacking an underlying source of liability. Thus, the Court will grant Defendants' motion to dismiss.

## I.  Background

Shmuel Herzfeld is a rabbi who founded and leads a Jewish school in Washington, D.C. ECF No. 25 ("Am. Compl.") ¶ 4. Following Hamas's attack on Israel in October 2023, Rabbi Herzfeld wanted to pray for the hostages held in Gaza and "for the Israeli soldiers who had been killed fighting" there. *Id.* ¶ 1. To that end, he and "a small group" went to the Israeli embassy in D.C. on March 21, 2024—the same day as "Taanit Esther," a "day of religious observance immediately preceding the Jewish holiday of Purim." *Id.* ¶¶ 1, 11. Some members of the group wore "traditional Jewish prayer" clothing and yarmulkes. *Id.* ¶ 11.

According to his amended complaint, another group had already established itself outside the embassy when Rabbi Herzfeld arrived. Am. Compl. ¶ 2. Allegedly organized by Hazami Barmada and Atefeh Rokhvand, these "pro-Palestinian, anti-Israel protestors" wore "earplugs or sound-cancelling headphones" and wielded "sound-producing equipment"—*i.e.*, "speakers and bullhorns"—"that [was] emitting extremely loud tones." *Id.* ¶¶ 2, 5–7. When Rabbi Herzfeld arrived, these protestors were "stretched along the entire city block in front of the embassy." *Id.* ¶ 12. And when he began leading his group in prayer—recorded, at his request—Barmada allegedly ordered the protestors to increase the noise by saying "it's time for the sirens." *Id.* ¶¶ 2, 13. Rabbi Herzfeld's group then allegedly received "[a]lerts" that "the sound level had reached the 95–100 dB range" on the decibel scale, *id.* ¶ 2—the "standard unit of measurement of sound."

*Grand Canyon Tr. v. FAA*, 290 F.3d 339, 343 n.2 (D.C. Cir. 2002). That noise "persisted for several minutes" and was, according to Rabbi Herzfeld, meant "to drown" him "out." Am. Compl. ¶¶ 13, 17.

An embassy staff member then brought Rabbi Herzfeld and his group inside. Am. Compl. ¶ 18. After a few minutes there, they "left the area." *Id.* Rabbi Herzfeld claims that he "immediately felt acute pain in his ear" when "the attack" happened. *Id.* ¶ 24. That pain "continued" when he "return[ed] home," so he "consulted with an otolaryngologist"—an ear, nose, and throat doctor. *Id.* That doctor diagnosed Rabbi Herzfeld with "acute acoustic trauma and prescribed medication." *Id.* But the "pain persisted into the following week," and Rabbi Herzfeld could not "participate fully" in "religious and personal activities" during that time, including the Purim festival. *Id.* ¶ 25. "[D]iscomfort in his ears" has also allegedly lingered until at least September 2024. *Id.* ¶ 26.

About a month after the incident, Rabbi Herzfeld sued Barmada and Rokhvand ("Defendants"). *See* ECF No. 1. He brought four claims: three for common-law tort liability and a fourth under D.C.'s statutory cause of action for harmful acts resulting from prejudice based on protected characteristics. *Id.* ¶¶ 26–42 (citing D.C. Code § 22-3704(a)). After Defendants moved to dismiss, Rabbi Herzfeld sought to amend his complaint. *See* ECF No. 19. The Court permitted him to do so, and he added one claim—civil conspiracy—while dropping Rokhvand from all counts except that new one and the statutory claim. Throughout this litigation, the parties have also filed a barrage of motions—to disqualify counsel (ECF No. 9), to strike a reply brief (ECF No. 18), for sanctions (ECF No. 27), and to strike yet another reply brief (ECF No. 33). The Court has dealt with those motions separately. Here, it addresses only Defendants' motion to dismiss the amended complaint under Rule 12(b)(1) and Rule 12(b)(6). *See* ECF No. 26.

## II. Legal Standards

A plaintiff must establish the Court's subject-matter jurisdiction to survive a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The Court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' . . . and upon such facts determine[s] jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Without subject-matter jurisdiction over a claim, the Court must dismiss it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

### A.    The Court Has Subject-Matter Jurisdiction

A federal "court must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). When a plaintiff relies on diversity jurisdiction under 28 U.S.C. § 1332, one potential jurisdictional defect is the amount in controversy. The statute requires that more than $75,000 be at stake, and Defendants contend that Rabbi Herzfeld "has not alleged damages" clearing this hurdle. ECF No. 26-2 at 16. Rabbi Herzfeld's operative complaint—the

amended, not the original—governs the jurisdictional question.  *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 30, 35–36 (2025).

That amended complaint says that Rabbi Herzfeld seeks more than $75,000.  Am. Compl. ¶ 8.  More precisely, he requests compensatory and punitive damages, injunctive relief, costs, and other relief "as the Court deems proper."  *Id.* at 14–15.[1]  Not good enough, Defendants say.  Rabbi Herzfeld's injuries are "de minimis" and "lack[] credibility" because the noise that the protestors created is "common in everyday life."  ECF No. 26-2 at 16–19.  And in their view, neither punitive damages nor statutory attorneys' fees can bridge the gap.  *See id.* at 19–21; ECF No. 31 at 13–14.

This jurisdictional inquiry is not as demanding Defendants would have it.  Rabbi Herzfeld asks for several kinds of damages and says that they exceed the jurisdictional minimum.  To reject those "claimed damages, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount."  *Bronner v. Duggan*, 317 F. Supp. 3d 284, 288 (D.D.C. 2018) (cleaned up and citation omitted).  A plaintiff may clear this low bar "even if" the Court "has serious doubts as to the bases for establishing the amount-in-controversy."  *Id.*  And that remains true even when a plaintiff appears to plead "with an eye toward the amount-in-controversy requirement" by alleging only that the "matter in controversy exceeds the sum or value of $75,000."  *Szymkowicz v. Frisch*, No. 19-cv-3329 (BAH), 2020 WL 4432240, at *5 (D.D.C. July 31, 2020) (quoting *Saiyed v. Council on Am.-Islamic Rels. Action Network, Inc.*, 742 F. Supp. 2d 84, 89 (D.D.C. 2010)).

Against that backdrop, the Court cannot say that it is "a legal certainty that" Rabbi Herzfeld "*cannot* recover the amount claimed or was never entitled to recover damages."  *Compton v. Alpha*

---

[1] Rabbi Herzfeld omitted his request for injunctive relief when arguing that this Court has diversity jurisdiction—a missed opportunity, perhaps, because "an action seeking an injunction to protect or vindicate" a plaintiff's "rights can meet the amount-in-controversy requirement."  *GEO Specialty Chems. v. Husisian*, 951 F. Supp. 2d 32, 39–40 (D.D.C. 2013); *cf.* ECF No. 28 at 12–16 (contending only that damages and statutory attorneys' fees satisfy that requirement).

*Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14 (D.D.C. 2014) (emphasis added). He alleges that he felt immediate "pain in his ear," later diagnosed as "acute acoustic trauma." Am. Compl. ¶ 24. That pain lingered into the next week and prevented him from fully participating in "religious and personal activities," including the Purim festival. *Id.* ¶ 25. And the "discomfort in his ears" remained until at least September 2024—half a year after the incident. *Id.* For these injuries—both physical and "emotional," *id.* ¶ 37—Rabbi Herzfeld seeks compensatory and punitive damages under common law and a D.C. statute expressly providing for such damages, *see* D.C. Code § 22-3704(a)(2), (3).

Defendants contend that Rabbi Herzfeld did not really suffer any serious ear pain (or any pain at all). But he need not "provide an exact valuation or detailed breakdown of damages at the outset of litigation." *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 90 (D.D.C. 2022) (quoting *Bronner ex rel. Am. Studies Ass'n v. Duggan*, 962 F.3d 596, 610 (D.C. Cir. 2020)). And the damages "tied to" his "emotional harms"—as well as his pain and discomfort—are at this point "unquantifiable variables" that are "difficult to ascertain from initial pleadings." *Compton*, 63 F. Supp. 3d at 14–15 (finding amount-in-controversy requirement met based on potential damages flowing from such harms). So no matter how much Defendants insist that bullhorns and sirens cannot injure someone in a way that meets the jurisdictional requirement, the Court's role at this point is "not to predict" the "amount that" Rabbi Herzfeld is "most likely to recover"—or his "prospects on the merits." *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 855 (7th Cir. 2022). And other than their evaluation of how seriously Rabbi Herzfeld was allegedly injured, Defendants

identify no basis for the Court to find that it is "legal[ly] certain[]" that "no jury would award" Rabbi Herzfeld "more than $75,000." *Compton*, 64 F. Supp. 3d at 15.[2]

Even if compensatory damages alone could not get Rabbi Herzfeld over the line, the possibility of punitive damages nudges him across.[3]  Those damages "count toward the amount in controversy so long as" they have "a colorable basis in law and fact." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 741 F. Supp. 2d 222, 233 (D.D.C. 2010) (citation omitted).  And recall that Rabbi Herzfeld brings claims "for intentional torts," each of which permits "punitive damages" as "relief." *Mitchell v. E. Sav. Bank, FSB*, 890 F. Supp. 2d 104, 110 (D.D.C. 2012).  So too for his statutory claim.  *See* D.C. Code § 22-3704(a)(3).  To obtain these damages, Rabbi Herzfeld would need to show that at least one defendant engaged in "outrageous conduct" that "is malicious, wanton, reckless, or in willful disregard for another's rights." *Tolson v. District of Columbia*, 860 A.2d 336, 345 (D.C. 2004) (citation omitted).  That standard for *prevailing* on a request for punitive damages is of course demanding, and courts should "scrutinize" such requests

---

[2] Defendants rely on *Rosenboro v. Kim*, 994 F.2d 13 (D.C. Cir. 1993), but that case does not support dismissing this one.  The posture in *Rosenboro* was different because a "paper record" had been "gathered through discovery."  994 F.2d at 16.  And that evidence showed that one plaintiff had "extremely minimal" "liquidated damages"—just a few "thousand dollars in medical expenses." *Id.*  But Rabbi Herzfeld does not rely on such expenses.  Rather, he seeks damages for pain and lingering discomfort in his ears, as well as for emotional distress.  *See* Am. Compl. ¶¶ 24–26, 37.  And unlike the *Rosenboro* plaintiffs, he requests punitive damages that place more money into controversy.  So even if the Court "has serious doubts as to" Rabbi Herzfeld's "bases for establishing" the "amount-in-controversy," the proper course at the "motion-to-dismiss stage" is to "find jurisdiction." *BYD Co. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 7 (D.D.C. 2021) (citation omitted).

[3] Rabbi Herzfeld again leaves something on the table with statutory attorneys' fees.  The problem this time is not that he failed to contend that such fees count toward the amount in controversy.  *See* ECF No. 28 at 14–15.  Instead, he makes that argument but provides no information that would allow the Court "to estimate the attorney's fees available"—no "billing rate[s]," no "estimated number of hours worked," nothing at all. *Rasay v. Pepperidge Farm, Inc.*, No. 22-cv-449 (BAH), 2022 WL 4300061, at *6 (D.D.C. Sept. 19, 2022).  And that defect prevents the Court from factoring these damages into the amount-in-controversy calculus. *See id.*

to ensure that they are "colorable" when "the availability of punitive damages is the sine qua non of federal jurisdiction." *Szymkowicz*, 2020 WL 4432240, at *9 (citation omitted). But "colorable" does not mean "likely to succeed." And Rabbi Herzfeld alleges, for example, that Barmada told the protestors to increase the volume; that the protestors then "targeted" him "in particular"; that they intended to (among other things) "cause him physical injury"; and that they "prepared for their onslaught by wearing ear plugs," suggesting that they knew the sound could be painful or harmful. Am. Compl. ¶¶ 2, 13, 15–16. Those allegations provide a colorable basis for punitive damages, even if they are unlikely to support such an award. Given that possibility, the lack of a legally certain limit on compensatory damages, and the law's "generous" plaintiff-friendly approach to "amounts in controversy," the Court finds that jurisdiction lies under § 1332. *BYD Co. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 7 (D.D.C. 2021).

## B. Rabbi Herzfeld Fails to State a Claim for Assault, Battery, or Intentional Infliction of Emotional Distress

On the merits, each of Rabbi Herzfeld's tort claims falters under Rule 12(b)(6). When applying D.C. law to these claims, the Court turns to "binding authority that controls" them or—absent that—aims to "predict how the District of Columbia Court of Appeals would decide the issue." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 124 (D.D.C. 2018).[4] And because

---

[4] Because the jurisdictional hook is diversity, the Court pauses to explain why District of Columbia law applies. To determine the applicable law, the Court applies the District's choice-of-law rules. *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014). Those rules call for "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Id.* (citation omitted). Relevant to that inquiry are the location of both the injury and the conduct that caused it, as well as the characteristics of the parties—their "domicile, residence, nationality, place of incorporation and . . . business, and the place where the relationship is centered." *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (internal quotation marks and citation omitted). And here those factors point to District of Columbia law. The embassy incident underlies every claim, and that encounter happened in D.C. Am. Compl. ¶ 1. Rabbi Herzfeld also lives in the District. *See id.* ¶ 4. And although Defendants reside

that court considers the Second Restatement of Torts and Professor Dobbs's Law of Torts, this Court will do the same. *See, e.g.*, *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971, 978 (D.C. 2023) (Second Restatement); *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) (Law of Torts). Those sources and established D.C. precedent show why Rabbi Herzfeld's claims fall short. Because he consented to being contacted by the soundwaves created by the pro-Palestinian protestors, he has not stated a claim for assault or battery. And his claim for "outrage" fails to meet the demanding standard that D.C. law imposes.

Begin with the assault and battery claims. The latter "is an intentional act that causes a harmful or offensive bodily contact." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (citation omitted). Or in slightly different terms, a defendant is liable for "battery when he intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, *and* the contact is . . . either harmful or simply against the plaintiff's will." Dan B. Dobbs *et al.*, The Law of Torts § 33 (April 2025 update) (emphasis added). Assault, on the other hand, does not require impermissible *contact*. Instead, it is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (citation omitted). A defendant is thus liable for assault if (1) "he acts intending to cause a harmful or offensive contact with" another or "an imminent apprehension of" that kind of contact, and (2) that person "is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21 (October 2024 update).

Rabbi Herzfeld theorizes that the "sound" from the bullhorns and sirens made "contact with" his "ear," and that contact with soundwaves can support tort liability. *See* ECF No. 28 at

---

in Virginia, that factor does not outweigh the other considerations—especially because the parties' limited relationship seems centered in D.C.

17–22.  Defendants challenge that rationale with a host of arguments, including that the District of Columbia does not recognize battery (or assault) via sound and that the First Amendment shields them from liability.  ECF No. 26-2 at 21–24, 30–31; ECF No. 31 at 6–9, 15–17.  More generally, they say that just "[b]eing a part of a loud crowd is not actionable as assault and battery"—in other words, Rabbi Herzfeld did not "fear[] immediate bodily harm from the noise at the protest" because he "enter[ed] the crowd" and chose to pray there "before going into the Embassy."  ECF No. 26-2 at 23; ECF No. 31 at 16 (internal quotation marks omitted).

Although Defendants do not spell out the latter theory clearly in doctrinal terms, the Court agrees that Rabbi Herzfeld has not plausibly alleged that Barmada is liable for assault or battery because he consented to being contacted by the soundwaves that the pro-Palestinian protestors created.

It is "black letter law that 'one who effectively consents to conduct of another . . . cannot recover'" in tort "'for the conduct or for harm resulting from it.'"  *IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 881 (D.C. Cir. 2020) (quoting Restatement (Second) of Torts § 892A(1)).  Put more bluntly: "no wrong is done to one who consents."  Restatement (Second) of Torts § 892A cmt. a; *see also id.* § 49 (explaining that § 892A applies to "the intentional invasion of interests of personality" like assault and battery).  And the same holds true when a person "manifests apparent consent" to an act even if he does not *actually* consent.  *Primedical, Inc. v. Allied Inv. Corp.*, No. 90-cv-1802 (NHJ), 1994 WL 149139, at *8 (D.D.C. Mar. 31, 1994) (quoting Restatement (Second) of Torts § 892A cmt. a).  Such "apparent consent" can arise from an individual's "words or acts"—or even "inaction"—and is "as effective to prevent liability in tort as if there were consent in fact."  Restatement (Second) of Torts § 892 & cmt. b–c; *see also id.* § 50 (explaining that § 892(2)'s rule on apparent consent applies to assault and battery).

Consent is why, for example, a linebacker does not accrue liability for assault or battery when he tackles a running back in a professional football game. Similarly, someone "who rides the subway may implicitly consent to" some "intentional jostling as other riders leave the car." Dobbs *et al.*, Law of Torts § 34. And even assuming that actual or threatened "contact" by sound can support assault or battery liability,[5] a person walking down a busy street actually or apparently consents to—and so cannot sue over—contact by many different soundwaves: those produced by a construction worker's jackhammer, a driver blasting music from his car, or an ambulance blaring its siren. This intuitive rule may explain why—along with the doctrinal uncertainty and the potential ramifications of accepting a contact-by-sound theory—assault and battery liability via soundwaves is not generally recognized.

Rabbi Herzfeld's claims falter because he consented to being exposed to sounds made by the pro-Palestinian protestors and their equipment, so he "cannot recover damages for those acts." Dobbs *et al.*, Law of Torts § 105.[6] When he arrived at the embassy, the protestors "were already

---

[5] Applying assault or battery liability to actual or threatened "contact" by sound would seem to stretch the bounds of tort law. Battery requires "contact with another's person." Restatement (Second) of Torts § 18 cmt. c. And while that rule covers "indirect[]" contact like throwing "water" on someone, it "is necessary" that the "actor intend to cause the other"—"directly or indirectly"—"to come in contact with a foreign substance." *Id.* Rabbi Herzfeld cites one case involving a claim of sonic battery. In *Hendricks v. Southern Bell Telephone & Telegraph Company*, 387 S.E.2d 593, 594 (Ga. Ct. App. 1989), the plaintiffs alleged that an individual had "tricked" one of them into "plac[ing] a telephone receiver to his right ear" while "a high frequency/high intensity tone" was "being transmitted over the line." But the appellate court did not explicitly hold that such soundwave contact constituted battery. Rather, it reversed the trial court's judgment and remanded for a new trial because of a defective jury instruction about battery liability "depend[ing] upon an actual intent" by the defendant "to hurt or to cause physical harm." 387 S.E.2d at 594, 596. The Court is aware of no other case in which a court has found this type of liability for soundwaves, although one suggested that a rare situation like using "a sonic weapon to intentionally cause permanent hearing loss" could constitute battery. *Eichenwald v. Rivello*, 318 F. Supp. 3d 766, 775 (D. Md. 2018).

[6] Allocating the burden of proof for consent is a "muddled" issue. Dobbs *et al.*, Law of Torts § 105. Sometimes consent is "treated as an affirmative defense, with the defendant bearing

encamped" there with "ear plugs," "sound-cancelling headphones," and "sound-producing equipment . . . that [was] emitting extremely loud tones."  Am. Compl. ¶ 2; *see also id.* ¶ 12.  Still, he proceeded into the encampment.  And instead of trying to avoid that environment, Rabbi Herzfeld told his group to "record" him praying on video, remained for "several minutes" within the noisy crowd, and "tried to make himself heard over the din."  *Id.* ¶¶ 13, 17.

Thus, this is not a case where a person saw (and heard) a crowd making loud noises, sought to avoid the crowd, but was pursued by it.  To the contrary, Rabbi Herzfeld's "nonverbal behavior" reasonably showed that he consented to exposure to the loud noises.  Dobbs *et al.*, Law of Torts § 35.  "[C]ustom" and "socially accepted practices" support that conclusion too, *see id.*, because "a certain amount of personal contact is inevitable and must be accepted" within "a crowded world," *McCracken v. Sloan*, 252 S.E.2d 250, 252 (N.C. Ct. App. 1979).  Simply put, when a person sees a protest in a public area, notices that the group is carrying devices that produce and amplify sound, and then enters the fray, that conduct signals consent to actions by the protestors that might cause acoustic "contact" with the person's ears.  To hold otherwise would permit anyone—"by his own fiat"—to knowingly enter a protest (or any crowd), "erect a glass cage around himself," and "announce that all" sonic "contact with his person is at the expense of liability."

the burden."  *Id.*  But "in many cases, consent marks a deficiency in the plaintiff's prima facie case at the most fundamental level": consent means that "the defendant's act is simply not tortious."  *Id.*  Put another way, "the plaintiff fails in one element of her" claim because "consent . . . negates any tortious intent."  *Id.*  Rabbi Herzfeld's own allegations show that he consented—actually or apparently—to the soundwave contact and thus cannot state a claim for assault or battery.  So whether viewed as a defect in his prima facie case or a defense that the amended complaint makes clear, he cannot recover for those torts.  And although Defendants could have pressed this doctrinal point more clearly, they underscore that Rabbi Herzfeld voluntarily entered the noisy protest.  *See, e.g.*, ECF No. 26-2 at 23–24 (contending that D.C. courts would not find assault or battery if an individual "walked into the thick of the noisy protest where sound amplification was in use"); *id.* at 29 (arguing, though in a different part of the motion, that Rabbi Herzfeld "subjected himself to, and impliedly consented to hear, the[] protest"); ECF No. 31 at 16.

*McCracken*, 252 S.E.2d at 252 (quoting W. Prosser, *Handbook on the Law of Torts* 37 (4th ed. 1971)).

This problem for Rabbi Herzfeld's assault and battery claims remains despite his allegations that he experienced ear pain. What matters is whether he "apparently consented to conduct," not the harm that allegedly resulted. Dobbs *et al.*, Law of Torts § 105. And because Rabbi Herzfeld did so consent, he "cannot recover damages for harm resulting from that conduct, even though" he "did not expect harm to result and did not consent to harm." *Id.*; *see also id.* § 108 ("[T]he defendant is guilty of no intentional tort so long as his acts are those consented to, even if harmful consequences result.").

Nor does it matter that Rabbi Herzfeld alleges that the protestors increased the volume of their noises with sirens after he began praying, because he has not alleged facts plausibly suggesting that Barmada—or even the protestors generally—went "beyond" his apparent "consent" by "do[ing] a substantially different act." *Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147, 153 (D.C. 1979). Consent to some acts, of course, is not consent to those "of a very different character"; agreeing "to a fight with fists" is not the same as agreeing to "stabbing with a knife." Restatement (Second) of Torts § 892A cmt. c. Instead, consent extends only to "substantially the same conduct." *Id*. But Rabbi Herzfeld's allegations here involve just that kind of conduct—*i.e.*, using the same (or similar) sound-producing equipment at a somewhat higher volume.[7] And in

_____

[7] Rabbi Herzfeld alleges that the sound made by the protestors "reached the 95–100 dB range." Am. Compl. ¶ 2. The Court may "take[] judicial notice of information posted on official government websites," *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 163 n.3 (D.D.C. 2021), and notes that the Centers for Disease Control and Prevention has described the sound from lawnmowers, movie theaters, motorcycles, and sporting events as falling within that range, *see* Centers for Disease Control & Prevention, *Listen Up! Protect Your Hearing*, https://perma.cc/K2U8-35FJ (last visited Aug. 5, 2025). So the level of noise that Rabbi Herzfeld alleges the protestors created did not exceed the level produced in these everyday circumstances that individuals commonly consent to.

concluding that Rabbi Herzfeld has not alleged that using louder sirens exceeded the scope of his apparent consent, the Court also considers the sounds in the "video" that he "incorporated by reference in the [amended] complaint." *Pharm. Rsch. & Mfrs. of Am. v. HHS*, 656 F. Supp. 3d 137, 151 n.7 (D.D.C. 2023) (citation omitted); *see also* Am. Compl. ¶ 14. That video "contains an unamplified recording of the sounds created," Am. Compl. ¶ 14, and further confirms that the protestors' conduct in making that sound is substantially the same as the conduct that a person consents to when walking into a group of protestors wielding "sound-producing equipment" like "speakers and bullhorns," *id.* ¶ 2. Moreover, neither Rabbi Herzfeld's allegations nor the video suggest that the protestors changed their behavior in a way that breached the limits of his apparent consent. For example, Rabbi Herzfeld does not allege that Barmada told the protestors to use the devices right next to his ears or to chase him after he left the area—conduct that would likely be outside the implicit consent conveyed by entering an active protest. *Cf. id.* ¶ 13 (alleging only that "[s]everal of these devices were no more than *a few yards* from Rabbi Herzfeld" (emphasis added)).

In sum, Rabbi Herzfeld "consented to the allegedly offensive acts" by walking into the crowd, so he "cannot recover in tort" for assault or battery. *Davis v. Bud & Papa, Inc.*, 885 F. Supp. 2d 85, 91 (D.D.C. 2012) (citing Restatement (Second) of Torts § 892A).

His claim for "outrage" fares no better. Am. Compl. ¶¶ 34–37. More commonly known as "intentional infliction of emotional distress," *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (citation omitted), this tort requires a plaintiff to plausibly allege "(1) extreme and outrageous conduct on the part of the defendants" that "(2) intentionally or recklessly (3) causes [him] severe emotional distress." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016) (citation omitted). The first element is demanding; it is met only if the alleged conduct is

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (citation omitted).  Put another way, conduct clears this hurdle only if it is "regarded as atrocious" and "utterly intolerable in a civilized society." *Id.* (citation omitted).

Rabbi Herzfeld has not plausibly alleged that Barmada acted outside "all possible bounds of decency," so he falters on the first element of this "very narrow tort." *Chen v. ICS Protective Servs.*, No. 23-cv-1253 (DLF), 2024 WL 4103700, at *3 (D.D.C. Sept. 5, 2024) (quoting *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045–46 (D.C. 2007), and then *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015)).  The nub of his amended complaint is that he saw protestors with sound-producing devices, walked into their midst, began praying, felt ear pain when the protestors increased the volume in his direction, and then left the area after several minutes.  Barmada allegedly planned that protest, *see* Am. Compl. ¶ 7, but Rabbi Herzfeld never alleges that she knew he was coming and orchestrated the protest to target him specifically.  Nor does he say that the protestors pursued him at Barmada's command—or even pursued him at all— once he left the protest area.  At bottom, this tort requires outrageous conduct, and Barmada's alleged actions fall short of that high bar.[8]  Her "conduct," which "took place on public streets," is instead "part and parcel of the frictions and irritations and clashing of temperaments incident to participation in a community life"—"especially life in a society that recognizes a right to public political protest."  *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163–64 (D.C. 2013) (internal quotation marks and citation omitted) (no likelihood of success on claim for intentional infliction of emotional distress despite "loud and disturbing" protests that included "oblique threats of 'future

---

[8] Again, in reaching this conclusion, the Court considers the video incorporated by reference into the amended complaint.  *See* Am. Compl. ¶ 14.

injury or disturbance'" on multiple occasions).[9]

To be sure, Rabbi Herzfeld claims that Barmada "intentionally or recklessly intended to inflict harm" on him.  Am. Compl. ¶ 35.  But while facts supporting that allegation might create liability for other torts (yet not here, as explained), that is not enough for intentional infliction of emotional distress.  *See Chen*, 2024 WL 4103700, at *3 (allegations "sufficient to support claims for assault, battery, and false arrest" did not "satisfy the elements of an [intentional infliction of emotional distress] claim").  For the same reason, Rabbi Herzfeld cannot advance this claim by alleging that Barmada "and the other Protestors" violated a D.C. municipal regulation setting maximum noise levels.  Am. Compl. ¶ 36.  Again, even if alleged conduct "may support" other legal violations or "causes of action," a "claim for intentional infliction of emotional distress" demands more.  *Williams v. Fed. Nat'l Mortg. Ass'n*, No. 05-cv-1483 (JDB), 2006 WL 1774252, at *10 (D.D.C. June 26, 2006).  That is especially true when the alleged violation is of a noise ordinance. Using that conduct to bootstrap an emotional-distress claim would transform a "very narrow tort" into a sweeping one—a result that the caselaw forecloses.  *Chen*, 2024 WL 4103700, at *3 (citation omitted).

That shortcoming on the first element dooms Rabbi Herzfeld's claim, but a defect with the third does too.  On this score, "general unhappiness and embarrassment"—and even "mental anguish and stress"—do not qualify as severe emotional distress.  *Bakeir v. Cap. City Mortg. Corp.*, 926 F. Supp. 2d 320, 340 (D.D.C. 2013); *Chen*, 2024 WL 4103700, at *4 (citation omitted).

---

[9] *See also, e.g.*, *Chen*, 2024 WL 4103700, at *3 (dismissing claim despite plaintiff's allegations that defendants "point[ed] . . . a flashlight in his eyes while" threatening him, "unlawful[ly] and forceful[ly] arrest[ed]" him, struck "at his ribs and shoulder," and lied to law enforcement, "resulting in" plaintiff's "prosecution" (citation omitted)); *Harris v. District of Columbia*, 696 F. Supp. 2d 123, 137–38 (D.D.C. 2010) (same for plaintiff alleging "that he was arrested without a warrant" at a daycare center, that "12 officers" used "excessive force" with "guns drawn," that he "was detained overnight," and that an officer "lied in his affidavit").

Rather, a plaintiff must plausibly allege that he suffered a "level of severe emotional distress" that is "so acute" that "harmful physical consequences are likely to result." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93–94 (D.D.C. 2015) (internal quotation marks, citations, and brackets omitted). Rabbi Herzfeld offers nothing of the sort. When describing the "harm" that he suffered, he points to immediate "acute pain," lingering pain during "the following week," and "continued . . . discomfort" for several months. Am. Compl. ¶¶ 24–25. He ties none of that to emotional distress, severe or otherwise. Indeed, all he says about such "severe emotional distress" is that he "suffered" it. *Id.* ¶ 37. But this kind of "conclusory assertion[]" parroting the legal standard "cannot support" a claim for intentional infliction of emotional distress. *Chen*, 2024 WL 4103700, at *4. For two reasons, then, Rabbi Herzfeld has not plausibly alleged that Barmada committed that tort.

## C.    Rabbi Herzfeld Fails to State a Claim Under D.C. Code § 22-3704

Rabbi Herzfeld also seeks relief under D.C. Code § 22-3704 against both defendants. The civil companion to D.C.'s hate-crime statute, this provision establishes a "cause of action" for "any person who incurs injury" because "of an intentional act" demonstrating the perpetrator's "prejudice based on" enumerated protected characteristics. D.C. Code § 22-3704(a). But for liability to attach, the defendant must have committed a "designated act" when harming the plaintiff. *Id.* A "designated act," in turn, means "a criminal act," *id.* § 22-3701(2)—specifically, "any criminal act recognized under D.C. law," *Aboye v. United States*, 121 A.3d 1245, 1250 (D.C. 2015).

That requirement is where Rabbi Herzfeld comes up short. To begin, he is far from clear about what criminal act he believes Defendants committed. He claims that they "subjected" him to "acts of intimidation and harassment." Am. Compl. ¶ 41. But he points to no provision of the District's criminal code, so the Court is left to guess precisely what he means by that. If by "intimidation" he refers to the law prohibiting "threats" of bodily harm, *see* D.C. Code § 22-407, he

misses the mark because one element of that crime is "utter[ing] *words to* another person," *Richards v. Gelsomino*, 814 F. App'x 607, 609 (D.C. Cir. 2020) (emphasis added) (quoting *Carrell v. United States*, 165 A.3d 314, 319–20 (D.C. 2017)).  Rabbi Herzfeld never says that either defendant spoke any words to him; at most, Barmada told *the protestors* to start using sirens.  Am. Compl. ¶ 13; *see also* ECF No. 28 at 31 ("Defendants attacked Rabbi Herzfeld with sirens, *not words*." (emphasis added)).  And even if those words count, they are not "of such a nature as to convey fear of bodily harm or injury to the ordinary hearer" and thus do not meet the second requirement for liability. *Thomas v. United States*, 249 A.3d 802, 805 (D.C. 2021) (citation omitted).  Barmada allegedly said only that "[n]ow it's time for the sirens."  Am. Compl. ¶ 2.  This "instruction" for people making noise to make more noise, *see id.* ¶ 14, is the kind of verbal command common at sporting events and concerts that does not cause the "ordinary hearer" to fear bodily harm such that criminal liability attaches.  And the context here does not suggest a different result.  Rather than try to leave the crowd when Barmada said those words or when the noise increased, Rabbi Herzfeld remained among the protestors "for several minutes" to continue praying.  *Id.* ¶ 17.  This predicate crime, then, is off the table.  So is stalking under D.C. Code § 22-3133, which requires for liability that the accused have "engage[d] in a course of conduct" proscribed in D.C. Code § 22-3132(8).  Among many reasons that Defendants' alleged conduct does not qualify as stalking, one problem is that "course of conduct" means "2 or more occasions"—more than the single incident underlying Rabbi Herzfeld's complaint.  *See* D.C. Code § 22-3132(8).

His opposition fails to cure these deficiencies.  Leaning on his "assault and battery claims," Rabbi Herzfeld insists that those "fall within the statutory purview" of § 22-3704 and thus qualify as a designated act.  ECF No. 28 at 30.  The District "does not have a separate statute criminalizing the common law offense of battery," but the provision prohibiting assault functionally covers

battery. *Perez Hernandez v. United States*, 286 A.3d 990, 999 (D.C. 2022). In any event, Rabbi Herzfeld never explains how (or even argues that) this law—D.C. Code § 22-404—would apply to Defendants' conduct when, as explained, the civil torts of assault and battery do not.[10]

Even if Defendants had somehow violated this criminal prohibition—presumably by aiding and abetting the protestors making the loud noise—Rabbi Herzfeld *still* could not rely on criminal assault as a designated act. That is because any crime premised on his assault-by-soundwave theory would have happened the moment the first soundwave struck him (or when he first feared that contact)—that is, when he first heard the protestors.[11] Assault and battery, after all, do not inherently turn on the *extent* of actual or attempted contact, nor is "physical injury" necessary. *Perez Hernandez*, 286 A.3d at 997–99. So the designated act would not have "demonstrat[ed]" either defendant's "prejudice," § 22-3704(a), since any hypothetical assault would have occurred *before* Barmada ordered the increased noise when Rabbi Herzfeld was praying among the protestors while wearing traditional Jewish clothing. *Cf. Lucas v. United States*, 240 A.3d 328, 335–42 (D.C. 2020) (interpreting the statutory phrase "demonstrates . . . prejudice" to "require[] that a defendant's bias . . . be a but-for cause of the defendant's underlying criminal act" for purposes of the hate-crime

---

[10] Rabbi Herzfeld has not argued that daylight exists between civil assault and battery claims and their criminal counterparts under D.C. law, and the Court will not "construct" that "legal argument[]" for him. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (citation omitted). That said, the Court recognizes that the D.C. Court of Appeals has held that "consent" is not a "defense to criminal prosecution" for assault with significant bodily injury. *Woods v. United States*, 65 A.3d 667, 669 (D.C. 2013). But *Woods* did "not determine whether and when consent is an affirmative defense to charges of simple assault." *Id.* at 668 n.1. And that case emphasized the *physical* and *harmful* nature of the brawl underlying the conviction—*i.e.*, "an assault stemming from a street fight in which one of the participants suffered significant bodily harm." *Id.* at 671. Given that focus, *Woods* held only "that consent is not a defense to a charge of assault with significant bodily injury arising out of a street fight." *Id.* at 672.

[11] That this conclusion logically follows from Rabbi Herzfeld's argument for tort liability confirms that civil assault and battery do not permit recovery here.

statute).  In other words, for Defendants' alleged assault to have demonstrated prejudice, Rabbi Herzfeld would have needed to allege that their prejudice *against him* prompted them to cause the *first* soundwave to hit him.  But that does not square with his allegation that Barmada "personally ordered th[e] *increase* in volume" that the encamped protestors were already making.  Am. Compl. ¶ 12 (emphasis added).

Finally, Rabbi Herzfeld seems to renounce any reliance on Defendants' alleged creation of a "criminal noise disturbance."  ECF No. 28 at 30 (describing this issue as "a red herring" and stating that his "claims do not turn on [it]").  That "disclaime[r]" is "waive[r]," and the Court's role is not to spell out that argument for him.  *McKinley v. FDIC*, No. 15-cv-1764 (KBJ), 2018 WL 11260466, at *1 (D.D.C. Sept. 30, 2018); *see also Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, 759 F. Supp. 3d 30, 39 (D.D.C. 2024) (not considering "argument" that the "[p]laintiff has disclaimed").  Still, the relevant regulations suggest that he would have needed to allege more on this front anyway.  All he says is that some members of his "group" received "[a]lerts" that "the sound level had reached the 95-100 dB range."  Am. Compl. ¶ 2.  But the measurement supporting any violation must happen "according to the test procedures prescribed by the administering agency," and the amended complaint says nothing about the "procedures" that led to the alleged sound-level alerts.  20 D.C.M.R. § 2701.3; *see also id.* §§ 2901–03 (describing requirements for sound-measuring equipment and procedures).  Plus, Rabbi Herzfeld alleges sound levels on the "dB range," *see* Am. Compl. ¶ 2, but the regulations use the "db(A)" range, *see* 20 D.C.M.R. § 2701.1—a different metric that "discriminates between frequencies in a manner approximating the sensitivity of the human ear."  *Grand Canyon Tr.*, 290 F.3d at 343 n.2.

In sum, Rabbi Herzfeld has not alleged that Defendants committed a crime under D.C. law in a way that demonstrates impermissible prejudice against him.  So he has not stated a claim under D.C. Code § 22-3704.

### D.    Rabbi Herzfeld's Claim for Civil Conspiracy Lacks an Underlying Tort or Other Unlawful Act

Rabbi Herzfeld's last claim tumbles with the others.  He alleges that Defendants are liable for civil conspiracy, from which the "battery, assault, outrage, and hate activity stemmed."  Am. Compl. ¶ 44.  As he seems to recognize, "[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort."  *Grimes v. D.C., Bus. Decisions Info. Inc.*, 89 A.3d 107, 115 (D.C. 2014) (citation omitted).  To reach a defendant through this liability theory, a plaintiff must allege "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme."  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).

The Court need not address those elements, however, because Rabbi Herzfeld fails to allege an underlying tort or unlawful action.  Civil conspiracy serves one purpose: "to spread liability for a successful tort claim to all agreeing parties," even if they did not "actually commit[] the tortious act."  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009).  The flip side is that a civil-conspiracy claim "fails unless the elements of the underlying tort are satisfied."[12]  *Id.*  As explained, none of Rabbi Herzfeld's "predicate" claims that could support conspiracy liability

---

[12] Because the Court finds that Rabbi Herzfeld has not stated a claim under D.C. Code § 22-3704, it need not decide whether that statutory claim could support conspiracy liability.  But the caselaw suggests that it could not.  *See Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) ("[W]e likewise have cited authority suggesting that a claim of civil conspiracy does not lie for violation of a statute absent statutory language to the contrary." (internal quotation marks and citation omitted)).

survive Defendants' motion to dismiss.  *Bey v. WMATA*, 341 F. Supp. 3d 1, 22 (D.C. 2018).  So the Court will dismiss his conspiracy claim too.

## IV.    Conclusion

For all these reasons, the Court will grant Defendants' Motion to Dismiss.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 5, 2025